In the

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy

Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

_____

No. 18-1735

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANDRES GARCIA,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-CR-356-3 — **Rebecca R. Pallmeyer**, *Judge.*

_____

ARGUED NOVEMBER 28, 2018 — DECIDED MARCH 20, 2019

_____

Before ROVNER, HAMILTON, and BRENNAN, *Circuit Judges.*

HAMILTON, *Circuit Judge.* A jury found defendant-appellant Andres Garcia guilty of distributing cocaine—actually distributing a kilogram of the stuff—to co-defendant Alan Cisneros in violation of 21 US.C. § 841. The government offered no direct evidence that Garcia possessed or controlled cocaine, drug paraphernalia, large quantities of cash, or other unexplained wealth. There was no admission of drug trafficking by Garcia, nor any testimony from witnesses (undercover

agents, criminal confederates, innocent bystanders, or sur-veillance officers) that Garcia distributed cocaine. Instead, the government secured this verdict based upon a federal agent's opinion testimony purporting to interpret several cryptic in-tercepted phone calls between Garcia and Cisneros, a known drug dealer.

This case illustrates the role trial judges have in guarding the requirement of proof beyond a reasonable doubt in crim-inal cases. It also reminds us of the connection between the roles that judges play in criminal cases, requiring proof be-yond a reasonable doubt, and in civil cases, where motions for summary judgment and for judgment as a matter of law re-quire judges to evaluate the outer limits of reasonable infer-ences under the lower civil standard of proof by a preponder-ance of the evidence. See generally *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–53 (1986) (comparing civil summary judgment standards to criminal standard discussed in *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). If the evidence would not allow a civil case to survive a motion for summary judg-ment or a directed verdict, then the case has no business being given to a jury in a criminal trial.

We assume the government's circumstantial evidence here might have supported a search warrant or perhaps a wiretap on Garcia's telephone. It simply was not sufficient to support a verdict of guilty beyond a reasonable doubt for distributing cocaine. We reverse the district court's decisions denying Gar-cia's motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and reverse his convictions for insufficient evidence.

I.  *Factual and Procedural Background*

A.  *The Investigation of Cisneros and his Conversations with Garcia*

Beginning in 2010, federal and state agents spent two years investigating an Illinois-based drug trafficking organization headed by Alan Cisneros, who, along with most of his co-conspirators, was affiliated with the Latin Kings street gang. The evidence against Cisneros included seizures of cocaine and cash used in drug deals, controlled buys made by both a confidential informant and an undercover agent, video footage from a camera concealed near Cisneros' two residences, live surveillance of his residences, consensually recorded telephone conversations, and judicially authorized wiretaps on three of Cisneros' telephones. The agents built a strong case against Cisneros. He ultimately pleaded guilty to possessing 500 grams or more of cocaine with intent to distribute. *United States v. Cisernos*, 846 F.3d 972, 974 (7th Cir. 2017).

Garcia appeared on stage for only a few days at the end of the Cisneros investigation. Between April 17 and April 20, 2012, agents recorded eight brief conversations between Cisneros and Garcia on one of Cisneros' wiretapped telephones. Garcia and Cisneros had several cryptic exchanges, punctuated by Garcia's two brief in-person visits with Cisneros. These conversations, as interpreted at trial by an ATF agent testifying as an expert witness, formed the basis for Garcia's conviction. Garcia did not contest that he was the person speaking with Cisneros on the calls, and the government and Garcia stipulated to the accuracy of the English translations of the Spanish conversations. We review them in detail, for their content was the entire case against Garcia.

The first recorded conversation took place on the evening of Tuesday, April 17, 2012. After exchanging pleasantries, Garcia asked Cisneros if he was "all set to work" and, if so, "around how much [did he] count on over there?" Cisneros responded, "yes," and "Like, two-four, something like that." Garcia replied, "That's not a problem … I'll go over there later." About an hour later, after a brief call verifying Cisneros' location, a surveillance camera showed a person entering one of Cisneros' residences who was "a little shorter" with "longer hair"—descriptors that matched Garcia. That same person left Cisneros' residence a "few minutes" later, along with another person whom agents never identified.

The next afternoon, on Wednesday, April 18, 2012, Garcia and Cisneros again spoke on the phone. Cisneros queried, "Hey, by any chance … did you see the girl yesterday or not?" Garcia demurred, "Noooo … why?" Cisneros explained, "because I went to the bar afterwards," and "she's really ugly … She scared me a little bit." Garcia expressed skepticism, "I took a little taste, I mean, you know? And everything, and she was … fine, you know?" Cisneros insisted, "every time I go to that bar, well, she's … really hot," but "now she was a bit fat and … a bit ugly." Garcia conceded that he would "check around and [he'd] call [Cisneros] right back" and "see what he says."

A few hours later, Garcia told Cisneros that he had "talk[ed] to these guys right now" and "it was the … the last of what they had," and "that everything came the same way[.]" But if Cisneros "can work that one," then "they will help us out with it, with something, they will give us a discount." Cisneros remained unpersuaded, insisting that "she's too fat, like really … really worn out." In fact, "she looks as if

… she had already been … worked at two or three bars." Garcia pushed back, noting that "I even told your brother like I … I grabbed some … And she did give a kick[.]" But, Garcia conceded, "let me give them another call right now and, so I'll see what they tell me."

Garcia reported back a few minutes later that he "spoke with them," and they wanted Cisneros to "work with her." Garcia had been told that "they already threw the tix forward," but "for the next one, he says that he could throw it to you for twenty-seven[.]" Cisneros objected that, "even if the next one were at twenty-five … if you do the math, no. … Let's say at around seventy, or, or sixty. Seventy … eighty … around there. … [I]t's not even worth the bad reputation, to tell you the truth … Why get a bad reputation with, with people?" Garcia replied, "So then let me, so let me tell this guy it would be better not to and … and to try with that one or to cook this one and we'll just wait and until he gets the rest."

Again, a few minutes later, Garcia was back in touch with Cisneros reporting that "the tix have already walked more that, that way." Garcia explained that if Cisneros could "hold on to it for about two or so days," then "he can change it for you." Garcia repeated that he was told, "Tell him to hold on to it there and so while we get um, uh, the, the rest and then we'll, we'll, we'll exchange it for him." Cisneros wanted to know, "By when, more or less[?]" Garcia replied, "by Friday," and "we'll give you another one within two days for sure."

These conversations sounded suspicious, understandably, to the agents monitoring Cisneros' telephones. Thinking that a delivery of drugs could be imminent, agents positioned themselves near Cisneros' two residences to conduct surveillance in person on the evening of Friday, April 20, 2012.

Garcia called Cisneros that evening to say he would "be right there so I can talk with you." Agents observed Garcia pull up in a gray Audi and walk to the front porch of one of Cisneros' residences. The agents did not notice Garcia carry anything to the residence. A few minutes later, Garcia and Cisneros got into the Audi, drove down the street, and entered another of Cisneros' residences. Agents still did not see Garcia carrying anything. After about fifteen minutes, Garcia left Cisneros' residence—again apparently without carrying anything—and drove away in the Audi with agents following him.

While Garcia was still driving, Cisneros and Garcia had another phone conversation. Garcia reported: "The little bit that I put on my tongue, it looks like it's, it's good, man, you know?" Garcia told Cisneros, "you test it," or "like casually, just tell one of those guys who are around, give a taste to someone around there to find out." Cisneros replied that he was "also the same right now." Garcia laughed, and said, "Yeah, right? Yes, so then, I said, 'Wow, what the!' … So what if I had put a good, uh, handful there." Garcia told Cisneros that they would "be in touch. If there's anything, call me."

The agents following Garcia's car believed he had narcotics with him. They conducted a traffic stop as he was turning into the driveway of his house. The agents' belief was not correct. The agents asked Garcia if they could search his car, and Garcia agreed. Although a narcotics-sniffing dog gave a positive indication that some sort of drug (legal or illegal) had been or was in the car, the agents found nothing of interest except two cellphones. They asked Garcia if they could look in the telephones, and again Garcia agreed. Checking the call

log, they confirmed that Garcia had indeed been in contact with Cisneros.

The agents then asked Garcia's family members if they could search the house. The family members agreed. The agents found nothing of interest—no drugs, no money, no drug paraphernalia, no wrappers or presses, no baggies or tinfoil, no pipes, no scales or ledgers.

Desiring to do a more thorough search of the car, the agents asked Garcia if he would return with them to the police station. Again, Garcia agreed. He was taken to the station and fingerprinted. The agents did not find any secret compartments in Garcia's car, which, according to the lead case agent at trial, are often used "for storing drugs, money, guns, things of that nature." Whatever suspicions the agents had were not borne out by the searches of Garcia's person, car, and home.

Garcia was nonetheless indicted in a thirty-five count indictment charging Cisneros and nine others with various drug trafficking and related offenses in connection with the Latin Kings' street-gang activities. Garcia, who was not a member of the Latin Kings, appeared in just two counts of this far-ranging indictment: supplying cocaine to Cisneros on April 17, 2012 (Count 28), and using a telephone to facilitate that transaction (Count 27), in violation of 21 U.S.C. §§ 841(a)(1) and 843(b), respectively.

B. *The Trial*

The government's theory at trial was that on Wednesday, April 17, 2012, Garcia sold "a large quantity of cocaine to Alan Cisneros in exchange for $24,000." The telephone conversations were evidence of this transaction because, the government contended, Garcia and Cisneros used "girl" to mean

"cocaine," and "two-four" to mean "twenty-four thousand dollars."

The government presented four witnesses at trial. All were ATF agents. None saw Garcia engage in distributing cocaine. None saw him in possession of cocaine, large quantities of cash, or drug paraphernalia. Three of the agent-witnesses carried out the Cisneros investigation, but they provided no evidence to corroborate the government's theory about Garcia's calls. Two of those three testified briefly about their first-hand observation of Garcia's visit to Cisneros on April 20, 2012, and the fruitless traffic stop and searches.

The third agent, Andrew Karceski, similarly described Garcia's visits to Cisneros' house and the traffic stop. He also read aloud to the jury the transcripts of Garcia and Cisneros' recorded conversations. Despite Agent Karceski's experience "surveill[ing Cisneros] for many, many, many hours, observ[ing] him throughout two years," the prosecutor explained to the judge that "we aren't asking [Agent Karceski] to opine or offer any opinions on what is being said in the conversations" with Garcia. (This was prudent. See, e.g., *United States v. Morris*, 576 F.3d 661, 675 (7th Cir. 2009).)

For that effort, the prosecution called instead a fourth agent, one who had no firsthand knowledge of the Cisneros investigation. The government offered Agent Christopher Labno as "an ATF special agent with experience interpreting drug code." After reviewing the transcripts, Labno testified that when Cisneros said "two-four," he was "Talking about $24,000." Agent Labno said his opinion was based on his experience that drug dealers will "Typically … just [use] numbers instead of someone saying I would like, you know, $25,000, it will be two-five, that type of thing."

No. 18-1735                                                                                   9

Agent Labno opined further that the type of drug Garcia and Cisneros were discussing was "powder cocaine" because "some examples of [] code words" used for cocaine include, "Work, girl, that white girl." In contrast, "example[s] of code word[s] for heroin" include "Boy, dog food, diesel." And the market price for cocaine in April 2012 determined the amount of drugs sold, with Agent Labno testifying, "I would say the [cocaine market price] range would be between approximately 24 to $28,000 a kilo."

Agent Labno similarly explained the remainder of Garcia and Cisneros' conversations solely by reference to "typical" or "common" use of phrases or courses of action by drug dealers in general:

- Garcia's use of the term "work"? Labno: "Ready to work or set to work and work in general is typically what is the code word for narcotics."

- Cisneros' reference to "the girl" being "worn out"? Labno: "The cocaine has been cut too much" because "[t]ypically cocaine come[s] into the country at 85 to 90 percent pure [and] then is distributed through various individuals and very often the practice is each time to add some cut and to take some cocaine out."

- What was meant by "tix"? Labno: "Tix refers to tickets, which is a common code word for money."

- Why was Cisneros talking about his "reputation"? Labno: "Typically, you want the best reputation you can for your product."

- And the mention of "cooking"? Labno: It meant to "[c]ook the cocaine into crack cocaine" because "I understand that one of the ways to recover cocaine that's been cut too much is to cook it into crack cocaine."

- What did Garcia mean by "taste"? Labno: He was "[t]esting the cocaine" because "[t]ypically individuals will either use a tester, someone who … can tell whether it's good or not. Sometimes they'll — another way would be to put it on a mucous membrane, basically your tongue, your nose, your mouth, your gum, to see if you get a numb sensation or that type of feeling."

- What about the reference to a "corner"? Labno: That meant "off of the kilo, only a small portion, a corner of it, had been sold," as "[t]ypically [cocaine is packaged as] a compressed brick … Sometimes it can be packaged in other items … If they conceal [it] in a pipe, it could be a circular puck. But very commonly, it's a brick."

Agent Labno testified that he formed an opinion as to these conversations based on *only* his view of how narcotics trafficking is "typically … done on the street in my experience." He acknowledged on cross-examination that he did not know Garcia and Cisneros and that he knew nothing specific

about them. Agent Labno agreed that the meaning of code words—to the extent they were code words—"would depend on the context." But, he insisted, although "I don't know the individuals, I know the context of narcotics trafficking very well." Defense counsel observed that Agent Labno apparently chose the "context" through which to interpret the conversations by "[a]ssuming that someone is guilty of narcotics trafficking." She thus laid the foundation for the point that, if one starts with the assumption that Garcia was trafficking cocaine, the conversations makes sense, but if one starts with the presumption of innocence, some further corroboration of actual criminal conduct is needed to prove guilt beyond a reasonable doubt. She moved for a judgment of acquittal, which Judge Der-Yeghiayan denied.

In closing argument, the prosecutor told the jury, "when you consider all of the evidence, the calls, the code, the surveillance and the traffic stop, you know that [Garcia] sold $24,000 worth of cocaine to Alan Cisneros on April 17th, 2012, and you also know that he used a cellular telephone to facilitate." The prosecutor concluded vaguely: "You know that what was said during those calls meant something." The jury returned a guilty verdict on both charges, finding that Garcia had distributed cocaine and had used a communication facility to distribute the cocaine. Defense counsel renewed her motion for a judgment of acquittal, which was again denied.

Upon Judge Der-Yeghiayan's retirement, the case was assigned to Judge Pallmeyer for sentencing. Judge Pallmeyer denied Garcia's post-trial motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. She found that Garcia sold one kilogram of cocaine based upon the evidence at trial and, with zero criminal history points and a

criminal history category of I, that his sentencing guideline range was 51 to 63 months. Garcia was sentenced to 48 months in prison on each count, to be served concurrently.

II. *Analysis*

On appeal, Garcia argues that the court should have entered a judgment of acquittal under Federal Rule of Criminal Procedure 29 because there was insufficient evidence to support his conviction beyond a reasonable doubt. We agree. Without corroborating evidence, the agent's opinion testimony regarding the meaning of Garcia's allegedly incriminating conversations amounted to educated speculation rather than proof beyond a reasonable doubt.[1]

We begin by laying out the general standards for reviewing sufficiency-of-the-evidence challenges, which the Supreme Court has taught can benefit from comparison to standards of proof in civil cases, such as when a judge may take a claim or issue away from a jury by granting summary judgment or judgment as a matter of law. We then review the application of the governing standard in relevant case law. We conclude by explaining why the chain of logic in the

---

[1] Garcia raised two other issues on appeal: (1) whether the trial judge abused his discretion by refusing to ask prospective jurors expressly about racial bias or anti-immigrant sentiment; and (2) whether the sentencing judge erred in finding sufficient evidence to support the drug quantity finding. As to the first issue, while more pointed voir dire questions might be advisable to elicit specific juror prejudices, existing precedent leaves this matter to the trial judge's discretion unless "racial or ethnic bias … is, or might be, a central aspect of the case"—a situation not present here. *United States v. Montenegro*, 231 F.3d 389, 394 (7th Cir. 2000). Because we set aside Garcia's conviction, we need not address the sentencing issue.

government's case failed to establish proof of Garcia's guilt beyond a reasonable doubt.

### A. *Standards of Review and Proof*

A trial judge, upon a defendant's motion or on the judge's own initiative, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction," either after the government has closed its evidence or after a jury has rendered a verdict or been discharged. Fed. R. Crim. P. 29(a), (c). In reviewing a district court's denial of a motion for judgment of acquittal, we do not defer to the district judge's decision. *United States v. Mohamed*, 759 F.3d 798, 803 (7th Cir. 2014).

In applying Rule 29, the court must view the evidence "in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Seidling*, 737 F.3d 1155, 1159–60 (7th Cir. 2013). We have often said that a defendant seeking a judgment of acquittal faces a "nearly insurmountable hurdle." E.g., *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017) (invoking chain of quotations); see also, e.g., *United States v. Tantchev*, 916 F.3d 645, 650 (7th Cir. 2019); *United States v. Maldonado*, 893 F.3d 480, 484 (7th Cir. 2018).

But, to be clear, we have also insisted that "the height of the hurdle depends directly on the strength of the government's evidence." *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013) (affirming grant of Rule 29 judgment of acquittal). Successful challenges are relatively rare, but "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979) (adding that "the same may be said of a trial judge sitting as a jury").

The Supreme Court has taught that, in applying Rule 29 and the reasonable-doubt standard in criminal cases, it is useful to compare the similar role that judges play in deciding motions for summary judgment and for judgment as a matter of law in civil cases, under Federal Rules of Civil Procedure 56 and 50. In *Jackson*, the Court explained that "the beyond-a-reasonable-doubt standard" requires a "quantum and quality of proof" that permits a judge to "distinguish between criminal and civil cases for the purpose of ruling on a motion for judgment of acquittal." *Id.* at 318 n.11. Similarly, in one of the iconic cases on summary judgment in civil cases, the Court returned to *Jackson*'s focus on "the actual quantum and quality of proof necessary to support liability," advising that a case should not go to a jury "if the evidence presented … is of insufficient caliber or quantity to allow a rational finder of fact to find" liability under the applicable standard of proof. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

*Anderson* explained that when a judge considers a motion for summary judgment, a directed verdict under Federal Rule of Civil Procedure 50(a), or a "First Amendment [case that] mandates a 'clear and convincing' standard," it is, "[i]n terms of the nature of the inquiry, … no different from the consideration of a motion for acquittal in a criminal case, where the beyond-a-reasonable-doubt standard applies and where the trial judge asks whether a reasonable jury could find guilt beyond a reasonable doubt." *Id.* at 250–52, citing *Jackson*, 443 U.S. at 318–19. In all of these contexts, the judge must consider "the substantive evidentiary standard of proof that would

apply at the trial on the merits." *Id.* at 252; see also *Ford v. Ahitow*, 104 F.3d 926, 938 (7th Cir. 1997) (*Jackson* inquiry is "no different from the consideration of the trial judge's inquiry in a motion for summary judgment or for a directed verdict," namely a "judge asks whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented").

The judge must ensure in both civil and criminal cases that determinations of credibility and the choices among reasonable inferences from the evidence are left to the jury. But in all of these contexts, the judge is still responsible for enforcing outer limits on reasonable inferences, guided by the relevant standard of proof. *Anderson*, 477 U.S. at 254–55; see also, e.g., *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 595 (1986) (affirming summary judgment in civil antitrust suit where "speculative or ambiguous" evidence did not support triable issue under preponderance-of-evidence standard); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 544–45 (7th Cir. 1997) (affirming district court's grant of judgment as matter of law; insufficient evidence to support jury verdict that defendants harbored any racial animus or had fired plaintiff to retaliate for her claim of employment discrimination). A judge facing a Rule 29 motion in a criminal case might benefit from first asking whether, if the evidence had been presented in a civil case, it would be sufficient to send the case to the jury.

B.  *Assessing the Required Quantum and Quality of Evidence in a Criminal Case*

As noted, reversals for insufficient evidence in criminal cases are relatively rare in modern federal practice. There are sufficient examples, however, to show that the evidence

against Garcia fell well short of what could support a finding of guilty beyond a reasonable doubt.

1.  *Surveying Sufficiency-of-the-Evidence Cases*

Comparing the government's evidence against Garcia to the amount and types of evidence that we have previously found sufficient or insufficient to carry the government's burden helps to map on which side of the line Garcia's case falls.

To support Garcia's conviction, the government cites *United States v. Cejas*, 761 F.3d 717 (7th Cir. 2014), as comparable in terms of the quantum of proof because no drugs were submitted as evidence at trial. In fact, the government's case in *Cejas* was much stronger than this one. In *Cejas*, a cooperating co-defendant testified that the defendants sold him drugs. *Id.* at 722. The government also offered surveillance video of the defendants leaving the drug deal and placing items in a toolbox attached to the bed of their truck. And when the agents promptly executed a traffic stop of those defendants, the agents recovered the $8,000 cash payment for the drugs and a gun from the truck's toolbox. *Id.* at 721–22. We found that the combination of the testimony of the drug buyer, the video of the use of the truck box, and the recovered cash and gun was sufficient to sustain the conviction. *Id.* at 727. There simply is no such corroborating evidence of criminal activity in the government's case against Garcia.

The remaining cases cited by the government bear even less resemblance to the case against Garcia. For example, in *United States v. Faulkner*, 885 F.3d 488, 491–92 (7th Cir. 2018), the defendant had admitted most of the charged conduct, and his admissions were corroborated by substantial amounts of recovered narcotics, incriminating recorded calls, and

testimony of several witnesses—including a cooperating co-defendant. Likewise, in *United States v. Mbaye*, 827 F.3d 617, 619–20 (7th Cir. 2016), the defendant had admitted engaging in the fraudulent activities and argued only his lack of fraudulent intent. On the issue of intent, the government offered testimony of both of his co-conspirators, as well as other actions indicating consciousness of guilt, such as not reporting his fraudulent income to the IRS and lying to investigators. *Id.* at 620.

In another case that "skate[d] very close" to the line between sufficient and insufficient circumstantial evidence, *United States v. Duarte*, 950 F.2d 1255, 1259 (7th Cir. 1991), the government had stronger evidence of the defendant's involvement in a drug conspiracy. No co-conspirators testified that Duarte bought or sold cocaine, and police found no drugs or paraphernalia in his presence. But Duarte shared a hotel room with another defendant who was arrested as he traveled to a second hotel room where the police later found more than a kilogram of cocaine. More than 100 telephone calls were made from Duarte's room in two days, and Duarte carried a pager, deemed then (it was 1990) a tool of the drug trade. The police found notes in Duarte's wallet that he had written and that a government expert said were records of drug transactions. We also emphasized that Duarte had lied to the police about just about every subject they asked him about, including providing a false address, using a car registered to a false address, and carrying a bogus driver's license, creating "a cloud of suspicion surrounding his presence in Milwaukee." *Id*. at 1260. Thus, even in *Duarte*, which marked a point very close to the outer bounds of sufficient evidence, there was considerably more evidence—the associate headed toward a kilogram of cocaine; the drug ledgers; the telephone calls and

pager; and the cloud of lies to the police—than the government offered against Garcia here.

Further illustrating the weakness of the government's case is the fact that the quantum and quality of evidence offered against Garcia were noticeably weaker than the evidence in a number of cases where we have reversed convictions for insufficient evidence.

For example, in *United States v. Jones*, 713 F.3d 336, 339–40 (7th Cir. 2013), the government presented a range of circumstantial evidence in its effort to convict defendant Jones of possessing cocaine with intent to distribute. We affirmed the district court's ruling that there was insufficient evidence to support a guilty verdict beyond a reasonable doubt because evidentiary gaps required the jury to speculate as to Jones's guilt.

The government's theory was that defendant Jones had helped a co-defendant, Finley, cook some cocaine into crack to fulfill a drug order from an undercover government informant—a theory supported by some circumstantial evidence. *Id.* at 341. Government witnesses testified as to their "interpretation of two recorded telephone conversations between Jones and Finley," including Jones seeming to relay his intention to pick up items at a CVS or Walmart that could be used to cook cocaine. *Id.* at 341–42. Jones also stated he was looking for a blender, which FBI agents testified could be used to cook crack. *Id.* at 343, 349. Two co-conspirators testified, including Finley's usual cocaine "cooker," who had not cooked for Finley on the day at issue. *Id.* at 342. The officers who conducted surveillance of Jones and Finley testified as to Jones's movements throughout the day. *Id.* at 341-45. And the jury heard testimony that Jones was in Finley's car during a police

chase on the relevant evening and that the officers recovered a plastic bag filled with crack that Finley threw from his car during the chase. *Id.* at 344-45. Finally, the government played a recording of Jones reporting to Finley after the police chase on his (Jones's) efforts to find the discarded crack in the neighborhood where Finley had thrown the bag. *Id.* at 341–45, 349.

Nonetheless, the circumstantial evidence in *Jones* was not sufficient to permit jurors, in terms of *Jackson*, "to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Despite the temptation to nod along with the government's evidence and think that of course the defendant was probably guilty, such gut feelings and suspicions do not relieve the government of the burden of offering sufficient evidence to prove guilty beyond a reasonable doubt. The government's evidence in *Jones* had not connected the links in the logical chain: "None of the intercepted telephone conversations showed an agreement between Jones and Finley to have Jones cook the cocaine." *Jones*, 713 F.3d at 349. "No witness testified that Jones cooked any cocaine or was ever in possession of any cocaine." *Id.* at 341. "No witness saw Jones in possession of the crack at any time [and] [n]o witness heard Jones admit that he had possessed the crack or that he had helped Finley cook the cocaine." *Id.* at 346. "Jones was never seen with any cooking utensils or diluents at any point during the day," nor was he "seen on the grounds of a CVS, Wal-Mart, or Walgreens where one might purchase such ingredients." *Id.* at 349. The search for the blender did not help because Finley's regular cocaine cooker testified that "he and others typically did not use a blender to cook cocaine, and no one ever saw Jones or Finley in possession of a blender." *Id.* Of the "three latent fingerprints on the bag [of discarded crack] none belonged to Jones." *Id.* at 345. And "the government could not

establish that any drugs were actually present" in the locations that officers observed Jones visit during the day at issue. *Id.* at 349. Filling this "evidentiary void" with "guesswork" and "speculati[on]" was impermissible. *Id.* at 348.

Another case in which we found evidence insufficient (against one of two defendants), *United States v. DiNovo*, 523 F.2d 197 (7th Cir. 1975), also mustered more evidence than was offered against Garcia. After Myron and Janet DiNovo led police and DEA agents on a high-speed chase, they searched the couple's home. In the bedroom, agents discovered two pounds of heroin in the dresser and drug-weighing scales in the closet. In the living room, agents found a briefcase with $14,000 in cash, foil packets of heroin, and seven hypodermic needles, six containing heroin. *Id.* at 199. Although there was sufficient evidence to convict Myron, the government did not submit evidence that would permit jurors to find that Janet also possessed the heroin: "There was no evidence to show that she owned the trailer," and the "Government offered no evidence of what type of clothing was in the dresser" with the heroin, "[n]or … what was in the portion of the closet where the scales were found." *Id.* at 201–02. The government's assertions, based on suspicious circumstantial evidence, that Janet was sufficiently connected to the heroin were simply not adequate. Nothing in *DiNovo* suggests that the result would have changed if the government had offered an experienced agent's opinion that wives usually help their husbands in drug-trafficking if the contraband is kept in their shared home.

Even within the limited set of cases in which we have found evidence to be insufficient, we could go on. For example, in *United States v. Mohamed*, 759 F.3d 798, 800–01 (7th Cir.

2014), the government presented highly suspicious evidence: the defendant, whose van was pulled over in Indianapolis, was carrying over 23,000 cigarettes purchased in Kentucky and a trash bag with over $15,000 in cash, and the defendant admitted that he made some money reselling cigarettes illegally for profit. Yet there was insufficient evidence introduced at trial that, as required for conviction, the defendant "intended to sell the cigarettes *in Indiana.*" *Id.* at 810. Similarly, in *United States v. Katz*, 582 F.3d 749, 750 (7th Cir. 2009), in an effort to convict the defendant of being a felon in possession of a firearm, the government presented "testimony from several law enforcement agents, a forensic technician, and tapes of two 911 calls, as well as stipulations by the parties"—including the defendant's ex-girlfriend's statement in her 911 call that defendant was holding "a weapon, which she described as a big revolver." That evidence was insufficient, however, because the weapon recovered with defendant's fingerprints was not a revolver but a 12-gauge shotgun, and the forensic technician could not rule out that defendant's fingerprints pre-dated his felony conviction. *Id.* at 752. We cautioned: "A jury cannot speculate its way out of reasonable doubt." *Id.*

Perhaps the most useful case was the most straightforward. In *United States v. Allen*, 383 F.3d 644 (7th Cir. 2004), we reversed defendant David L. Allen's 2003 conviction for being a felon in possession of a firearm because there was insufficient evidence tying him to the predicate felony conviction. One David L. Allen had been convicted of dealing in cocaine in 1995. *Id.* at 645–46. The future federal defendant David L. Allen was arrested in 1999 on a post-conviction warrant issued in the 1995 case. He did not argue then that the arrest was a case of mistaken identity—i.e., that he was not the same

David L. Allen who had been convicted in 1995. But after the Allen who was arrested in 1999 was arrested again in 2003 and charged with being a felon in possession of a firearm, he argued the government could not prove he was the same David L. Allen who had been convicted in 1995. *Id.* at 646.

The 1995 report contained no identifying information beyond a case number and his name—no fingerprint, photograph, or physical description. But the district court found Allen guilty because (1) he shared the same name with the 1995 defendant, (2) he had not objected in 1999 to being arrested in connection with the 1995 offense, and (3) a common case number was associated with all three arrests, making it reasonable to infer that the 2003 defendant was the same person convicted in 1995. *Id.* While the district judge's inferences were reasonable, we reversed. The question was not whether a logical set of inferences could show the charge was possibly or even likely true, but whether it could be inferred *beyond a reasonable doubt* that the defendant was guilty as charged. *Id.* at 649. Our answer was no.[2]

---

[2] See also *Piaskowski v. Bett*, 256 F.3d 687, 689–90, 693 (7th Cir. 2001), where we found the evidence was insufficient to sustain the murder conviction. Our dissenting colleague understates the evidence against Piaskowski. See post at 38**.** The evidence showed that the defendant had expressed anger at the victim, the defendant had told a witness shortly before the murder that "there was some shit going down," another suspect's confession placed the defendant at the scene of the murder, and a co-defendant admitted that he had attacked the victim "like everybody else," presumably including defendant. We held that the verdict was premised on "conjecture camouflaged as evidence," and "require[d] a leap of logic that no reasonable jury should have been permitted to take"). Other cases reached similar conclusions. See, e.g., *United States v. Griffin*, 684 F.3d 691, 693–95, 698–99 (7th Cir. 2012) (insufficient evidence for felon-in-possession conviction despite agents' seizure at defendant's residence (owned

We have not found other cases in this circuit where the government tried to bridge the evidentiary gap, as it did here, solely with an agent's expert opinion, but similar efforts have not fared well in the Second Circuit. In *United States v. Young*, 745 F.2d 733, 738–39 (2d Cir. 1984), the Second Circuit vacated the conspiracy conviction of one defendant, Tangee Afflic, who had been charged with serving as a courier in a heroin network. Afflic shared an apartment with Young, a defendant convicted of a larger role in the conspiracy, *id.* at 744, and she lived in what appeared to be an apartment building that was "a vertically integrated heroin distribution network." *Id.* at 757. Afflic was also the subject of extensive surveillance, during which she was seen delivering shopping bags or small packages to various locations, and was mentioned or recorded on intercepted phone conversations that "the government contended were 'coded,'" including communications

---

by his parents) of ten firearms and five sets of ammunition, testimony from his probation officer that she told his father there should not be firearms in the house, and slightly inaccurate testimony from jailhouse informant that defendant admitted to owning two of the guns that were found in the kitchen; we reasoned that because there was "no evidence that [defendant] himself ever had actual physical possession of the shotgun … no evidence of his fingerprints … nor did any witnesses testify that they had seen [defendant] holding or using them," the jury was simply "speculat[ing] its way out of reasonable doubt") (quotation marks omitted); *United States v. Jones*, 371 F.3d 363, 364–66, 368 (7th Cir. 2004) (insufficient evidence to convict Jones of transferring gun to another state's resident despite video evidence of Jones accompanying his co-defendant to purchase gun illegally, agent's testimony that Jones accompanied his co-defendant across state lines to sell gun, and admission of co-defendant's statement describing scheme; "[t]he government might have obtained support for [its theory] if the ATF had further investigated," but "[a]ll the government brought to trial was its speculation").

describing efforts at "detecting or eluding surveillance." *Id.* at 742–44.

The court found that this evidence was sufficient to support probable cause for a search of Afflic's apartment, during which agents found an automatic rifle, two loaded 50-shell magazines, fur jackets, and gold jewelry worth thousands of dollars. *Id.* at 744–45, 757–58. This evidence was not sufficient, however, to support Afflic's conviction. *Id.* at 764. The amount of unexplained wealth was "relatively small," and the "surveillance testimony" describing Afflic's delivery of "a 'white' bag'" to other conspiracy participants was underwhelming. *Id.* The court explained that "the most this evidence established was that [she] was aware of the conspiracy and associated with some of its members"—not enough to prove her own guilt beyond a reasonable doubt. *Id.* The agent's expert opinion did not carry the day but was still deemed admissible because it "was not used to explain the absence of any corroborating physical evidence in the government's case, but was instead used to explain physical evidence that was in the case." *Id.* at 761.

Nevertheless, the expert opinion drew a word of "caution" because it was "offered to establish that ambiguous conduct constitutes criminal activity." *Id.* at 765 (Newman, J., concurring). Judge Newman explained that one must

> question whether an [experienced narcotics agent] expert's opinion that the events he observes constitute a drug transaction provides very much, if any, assistance to a jury, beyond whatever inference is available to be drawn by the jury from all the evidence. … Whatever slight probative value arises from a narcotics

expert's personal opinion that an observed transaction involved a sale of drugs must be carefully weighed against the distinct risk of prejudice. The 'aura of special reliability and trustworthiness' surrounding expert testimony, which ought to caution its use, especially when offered by the prosecution in criminal cases, poses a special risk in a case of this sort. That risk arises because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial. …

The hazard of permitting the opinion in evidence ought to make courts cautious in assessing the sufficiency of a case based heavily on such an opinion. If the observed actions of a defendant do not establish a prima facie case, I do not believe that an expert's opinion that his actions are criminal may carry the prosecution's proof above the requisite line. It is one thing to permit a jury to weigh that opinion in considering an otherwise adequate case; it is quite another matter to let that opinion salvage an insufficient case.

*Id.* at 765–66 (internal citations omitted); see also *United States v. Boissoneault*, 926 F.2d 230, 234–35 (2d Cir. 1991) (reversing conviction for possession of cocaine with intent to distribute and endorsing Judge Newman's concurrence in *Young*; agent's expert opinion could not supply sufficient evidentiary basis to infer intent to distribute beyond reasonable doubt); *United States v. Sette*, 334 F.2d 267, 269 (2d Cir. 1964) (reversing

conviction because sole evidence that defendant engaged in illegal gambling was two agents' "opinion testimony" based on "their observations and their general knowledge of the gambling business"; this did not "suffice[] to make a case for the jury" where agents "utterly failed" to follow through on surveillance and other evidence-gathering efforts—"the proper and recognized manner of proving" the offense).

### 2. *Assessing the Evidence Against Garcia*

Returning to this case here, the government's case "consists entirely of inferences the government argues may be drawn" about Garcia's conversations, and we must decide "whether this evidence permits an inference beyond a reasonable doubt." *Allen*, 383 F.3d at 647. "Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001).

In making this assessment, a judge must take special care to guard against the possibility that a defendant might be found guilty by either speculation or mere association. Circumstantial evidence that leads only to a "strong suspicion that someone is involved in a criminal activity is no substitute for proof of guilt beyond a reasonable doubt." *Id.* at 692. And evidence that calls for inferences that are "motivated or made possible by speculation"—especially inferences "focused on a defendant's presence or association with criminals or their criminal activity"—will fail to carry the government's burden. *Jones*, 713 F.3d at 347. It is simply not enough to "fill the [evidentiary] gaps with inferences of guilt by association or evidence of an individual's mere presence somewhere criminal activity may have occurred." *Id.* at 352.

With our focus on Garcia and Cisneros' conversations, a key government contention is that the use of the word "girl" meant "cocaine," and the word "work" also meant either "cocaine" or "drug dealing." We do not doubt Agent Labno's testimony that some drug dealers use these code words for cocaine and drug dealing. But we have also heard expert testimony in other cases regarding other code words used by drug dealers. See e.g., *United States v. Vasquez*, 679 F. App'x 470, 471 (7th Cir. 2017) (agent testified based on his experience and training that defendants used code word "cabbage" to refer to cocaine); *United States v. Hughes*, 970 F.2d 227, 237 (7th Cir. 1992) (agent testified that "terms like 'a gallon of paint' and 'truck,' 'van,' and 'tractor' … indicated the involvement of a kilogram quantity of cocaine"). From a two-year investigation into Cisneros' drug-dealing activities, the government did not offer any corroboration that Cisneros (and not just a "typical" drug dealer) referred to cocaine as "girl" or "work," such that a juror could reasonably infer that Garcia understood Cisneros to be talking about cocaine.

The next link in the government's inferential chain is that Garcia understood Cisneros' phrase "two-four," to mean Cisneros would pay $24,000 for one kilogram of cocaine. Agent Labno may have correctly hypothesized that "two-four" meant $24,000, which was, perhaps fortuitously, at the bottom of his estimated range of market prices for a kilogram of cocaine in Chicago in mid-2012. But like any commodity, cocaine's market price can fluctuate, which would make any corroboration of Labno's estimate helpful for proof beyond a reasonable doubt. After all, other agents' expert testimony in other contemporary cases opined that several months after Garcia's alleged sale, the 2013 Chicago-area market price for a kilogram of cocaine was—at the low end—$34,000 per

kilogram. See, e.g., *United States v. Delgadillo*, Case No. 13-cr-673, Doc. 111-3 at 1–2 (July 1, 2014) and Doc. 151 at 278–79 (N.D. Ill. July 22, 2014) (agent offered expert opinion that 2013 Chicago market price for cocaine purchased in bulk quantity of six kilograms was $34,000 per kilogram, but "if the person was going to buy less, there is a possibility that the price could actually increase"); *Vasquez*, 679 Fed. Appx. at 471–72 (law enforcement agent's testimony that defendant sold a kilogram of cocaine for $36,000). Again, there was no corroboration here.

Did Cisneros refer to money as "tix" so he would share Agent Labno's suggested understanding of Garcia's comment? Did Cisneros' concern about his "reputation" mean his reputation as a drug dealer, so that Garcia would take from that concern what Agent Labno suspected? Did Cisneros ever "cook" his cocaine, so that Garcia's suggestion was likely to be what Agent Labno presumed? Was Cisneros' cocaine typically packaged in bricks, pucks, or some other form, such that one could find Agent Labno's speculation about the meaning of "corner" more helpful than not? We and the jury could speculate, but that's not enough.

Agent Labno's experience let him offer informed and perhaps accurate speculation about the likely meaning of Garcia's calls with Cisneros. Their conversations were certainly suspicious. They might well have supported applications for search warrants or further wiretaps. We recognize that it is possible, perhaps even likely, that Garcia was guilty in fact. But "[t]he heavy standard applied in criminal cases manifests our concern that the risk of error to the individual must be minimized even at the risk that some who are guilty might go free." *Addington v. Texas*, 441 U.S. 418, 428 (1979). These

cryptic conversations, filtered through an agent's experience with other, unrelated cases without any corroboration that Garcia was actually trafficking in cocaine, were not sufficient to support a criminal conviction. See *Piaskowski*, 256 F.3d at 693 (reversing verdict based on "conjecture camouflaged as evidence").

District judges have a wealth of experience in applying the varying standards of proof to gauge the sufficiency of the government's evidence. When considering motions for summary judgment or directed verdicts, judges are accustomed to considering carefully whether civil plaintiffs' "actual quantum and quality of proof" are of "insufficient caliber or quantity to allow a rational finder of fact to find" liability to send the matter to trial or to the jury. *Anderson*, 477 U.S. at 254. When faced with a close criminal case, the judge's experience with parallel issues in civil cases may prove helpful in deciding the boundaries of permissible inferences when the government must prove its case beyond a reasonable doubt—which is so much more stringent than the civil standard of proof. *California ex rel. Cooper v. Mitchell Brothers' Santa Ana Theater*, 454 U.S. 90, 92–93 (1981). The evidence here fell well short of proof beyond a reasonable doubt on the charges against Garcia.

The judgment of the district court is

REVERSED.

BRENNAN, *Circuit Judge*, dissenting. The jury was presented with enough evidence at trial to find Garcia guilty beyond a reasonable doubt. Viewing that evidence under the controlling legal standard of FED. R. CRIM. P. 29(c), I respectfully part company with my colleagues and defer to the jury's verdict.

### A.  The Trial Evidence

After a three-day trial, receiving instructions, and deliberating, the jury unanimously convicted Garcia on two counts: (1) using a cell phone to distribute a controlled substance in violation of 21 U.S.C. § 843(b); and (2) knowingly and intentionally distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1).[1] The trial evidence did not contain the proverbial "smoking gun"—Garcia was not caught holding a kilogram of cocaine—but it did include:

- Eight recorded phone conversations between Garcia and a suspected drug distributor, Cisneros, with both men using multiple coded terms;

- Unchallenged and unrebutted expert witness testimony explaining those coded terms, individually and cumulatively, refer to the distribution of cocaine;

- Two cell phones found in Garcia's possession and a corresponding call log

---

[1] The jury was properly instructed that it needed to find guilt beyond a reasonable doubt on each element of the two counts, weigh the evidence, and render its verdicts based on that evidence.

confirming the calls between Garcia and
Cisneros;

- Photographic and video surveillance from a
  pole camera of Garcia on April 17, 2012
  entering a residence owned by Cisneros and
  leaving the residence a few minutes later;

- Photographic, video, and in-person
  surveillance of Garcia on April 20, 2012
  pulling up to Cisneros' house, walking to the
  front porch, returning to the vehicle with
  Cisneros, driving to another residence
  owned by Cisneros, entering the second
  residence with Cisneros, and driving away
  alone about 15 minutes later; and

- The testimonies of three law enforcement
  officers corroborating the surveillance of
  Garcia on April 17, 2012 and April 20, 2012
  and identifying him as the same person who
  entered Cisneros's residences on both days.

The majority opinion considers the recorded cell phone
conversations as interpreted by Bureau of Alcohol, Tobacco,
and Firearms Special Agent Christopher Labno as the entire
case against Garcia. For the majority, Labno's testimony was
insufficient for a rational jury to convict Garcia on the
distribution charge.[2] It labels this evidence uncorroborated—

---

[2] The majority opinion does not separately address the sufficiency of
the evidence concerning the cell phone count. Given the stipulation to
Garcia's voice on the recorded calls, the sufficiency of the evidence as to
narcotics "distribution" is presumably dispositive on the cell phone count
as well.

"educated speculation"—rather than proof beyond a reasonable doubt.

This phone call evidence has two parts: the calls themselves, and Labno's expert interpretation of them.

First, the contents and topics of the phone calls show:

- The respective roles played by Garcia as the seller and Cisneros as the buyer;

- The roles and reactions of other actors, Garcia's suppliers, including that they would be willing to work with Cisneros on future deals;

- The progression of the sale, from how much Cisneros wanted to pay, to concerns about its quality, discussion as to price, and taste testing the product;

- How Cisneros's reputation as a seller could be adversely affected if Garcia sold Cisneros inferior product; and

- How the product may have to be altered by "cooking."

In their numerous conversations, Garcia and Cisneros do not explicitly reference "cocaine," as drug dealers almost never do and would not. They instead used common terms as substitutes ("work," "girl," "white girl," "tix," "taste," "worn out," "cook," "two-four," *etc.*). While an untrained juror may not be familiar with these terms, federal courts routinely permit an expert witness to be "helpful to the jury" in interpreting such evidence. *See United States v. Ceballos*, 302 F.3d 679, 687-88 (7th Cir. 2002) (DEA agents'

interpretations were "helpful to the jurors" in applying "alternative theories of which they ordinarily would not have been aware") (internal quotations omitted); *see also United States v. Jones*, 763 F.3d 777, 802 (7th Cir. 2014) (an expert witness may "assist the jury" in resolving ambiguities); *United States v. York*, 572 F.3d 415, 423 (7th Cir. 2009) (allowing expert witnesses to translate "drug jargon and code words that might seem entirely innocuous to an untrained jury."). Just as a jury may need the assistance of a translator to consider whether a foreign-language conversation concerns distributing cocaine, the same can be true of coded drug jargon.

This brings us to the second part of the phone call evidence, Agent Labno's testimony. Labno has operated as an undercover special agent in Chicago for approximately 16 years. He testified to his familiarity with the price, quantity, and quality of cocaine, including common code words used in local drug trafficking. He also testified to his personal use of a cell phone to facilitate drug dealings, and his own experience cooking "crack" as an undercover agent. It would appear there is no aspect of the local cocaine distribution process with which Labno is not familiar.[3]

---

[3] The majority opinion notes how Agent Labno "had no firsthand knowledge of the Cisneros investigation." Of course, if he had such knowledge and was called as a fact and expert witness, that could be criticized as confusing the jury, and require precautions to minimize potential prejudice. *See United States v. Farmer*, 543 F.3d 363, 369 (7th Cir. 2008) (citing *United States v. Goodwin*, 496 F.3d 636, 641-42 (7th Cir. 2007)). Given Labno's role as an expert, his not knowing Garcia and Cisneros should not be characterized as a negative. Indeed, this court has stated experts need not be familiar with a "particular conspiracy" but "can determine, based on their expertise, that certain words have drug-related

At trial, the defendant did not object under FED. R. EVID. 702 to Labno's expertise or to the jury's reliance on his expert interpretations when weighing the evidence. Indeed, Garcia's counsel cross-examined Labno only briefly (four pages of transcript). The majority opinion credits the cross-examination of Agent Labno for laying a foundation that the taped conversations make sense only if Garcia is assumed to be drug trafficking. But in his response to that question, Agent Labno specifically denied that assumption: "I'm not making assumptions about that. I'm just interpreting what the wiretap conversations are based on the code words in the context in my experience."

Garcia's principal argument at trial was that the recorded conversations were so ambiguous the jury could not reasonably determine their meaning.[4] In helping the jury interpret the phone conversations, Labno explained that, in his experience, the terms "work" and "girl" refer to cocaine; "taste" and "cooking" refer to the quality of cocaine; "tix" or "tickets" refer to drug payments; and "two-four" refers to

---

meanings within the context of a single conversation." *United States v. York*, 572 F.3d 415, 424 (7th Cir. 2009).

[4] Because Garcia stipulated that the conversations were ambiguous, he opened the door to Labno's interpretation. An expert's interpretation may be helpful to the jury in determining the meaning of words and terms—no matter how common they may be—when they are used ambiguously in conversation. *See York*, 572 F.3d at 423 (recognizing expert's interpretation when "six," "nine," "five dollar," and "fifty-five" were used ambiguously in defendant's conversations); *see also United States v. Ceballos*, 302 F.3d 679, 687-88 (7th Cir. 2002) (upholding agents' interpretations of simple pronouns "it," "them," and "both" as referring to methamphetamine shipments because defendants used those pronouns ambiguously in conversation).

$24,000, the going market-price for a kilogram of cocaine. We have often recognized these same expert interpretations in other drug cases. In *United States v. Fuller*, 532 F.3d 656, 661 (7th Cir. 2008), we recognized defendant's use of the code word "work" to mean cocaine. *See also United States v. Page*, 521 F.3d 101, 108-09 (1st Cir. 2008) (noting "work" was the typical drug-dealers' code for cocaine); *United States v. Benitez*, 92 F.3d 528, 532 (7th Cir. 1996) (same). After hearing Labno's interpretation of the phone calls, it was still up to the jury to decide how much weight to give his testimony and to draw its own conclusions about the actual meaning of the conversations. The jurors did just that.

## B. The Legal Standard

Under Rule 29(c), the standard a defendant must meet in challenging the sufficiency of the evidence on a criminal conviction is very high. *See United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014) (the defendant's Rule 29 burden is "nearly insurmountable"); *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013) ("a nearly insurmountable hurdle"); *United States v. Griffin*, 684 F.3d 691, 694 (7th Cir. 2012) ("a heavy burden"); *United States v. Bogan*, 267 F.3d 614, 623 (7th Cir. 2001) ("a nearly insurmountable burden"); *United States v. McCaffrey*, 181 F.3d 854, 856 (7th Cir. 1999) ("a daunting task").

Rule 29 post-verdict review is narrowly limited to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This "does not require [the] court to ask itself whether *it* believes that the evidence at the trial established

guilt." *Jackson*, 443 U.S. at 318-19 (internal quotations omitted); *see also Jones*, 713 F.3d at 340 ("The inquiry does not ask what we would have decided if we were on the jury. We need not be convinced by the evidence ourselves."); *United States v. Genova*, 333 F.3d 750, 757 (7th Cir. 2003) ("Rule 29(c) does not authorize the judge to play thirteenth juror."). We will "overturn the jury's verdict only when the record contains no evidence, regardless of how it is weighed, from which the factfinder could find guilt beyond a reasonable doubt." *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018) (internal quotations omitted); *see also United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008) ("[W]e will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt.") (internal quotations omitted).

The evidentiary standard of proof—beyond a reasonable doubt—does not change during post-verdict review. But, unlike pre-verdict, the evidence is construed "in the light most favorable to the government," creating a rebuttable presumption of conviction. *See United States v. Seidling*, 737 F.3d 1155, 1159 (7th Cir. 2013); *see also United States v. Niggeman*, 881 F.3d 976, 980 (7th Cir. 2018) (We "draw all reasonable inferences in the light most favorable to the prosecution."). While the evidence must "reasonably support a finding of guilt beyond a reasonable doubt," *Jackson*, 443 U.S. at 318, deference to the jury's deliberations prevents the court from assessing the quality of the evidence any further. *See United States v. Smallwood*, 188 F.3d 905, 913-14 (7th Cir. 1999) (court defers to the jury's credibility determinations without making its own); *see also United States v. Reed*, 875 F.2d 107, 111 (1989) (in reviewing a Rule 29 motion

the judge must respect "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences.").

The narrow scope of Rule 29 is defined by phrases such as "*no* evidence" and "*devoid* of evidence." This language focuses the court's Rule 29 role on assessing the quantum of evidence, not its weight or credibility. In conducting a quantum analysis, the court must determine whether the evidence, "taken as a whole," is enough for any rational jury to find guilt beyond a reasonable doubt. *Smallwood*, 188 F.3d at 913. Unless Garcia rebuts the presumption of conviction by showing the government submitted *no evidence* for a rational factfinder to find him guilty beyond a reasonable doubt, the standard requires that we defer to the jury's verdict.

The standard does not require, though, that we explain how the case might fare in the civil context. The majority opinion compares the judge's role under Rule 29 with the judge's role in considering motions for summary judgment under FED. R. CIV. P. 56 and judgment as a matter of law under FED. R. CIV. P. 50, respectively. This suggestion is fine to the extent it repeats current law toward a helpful comparison. But "enforcing outer limits on reasonable inferences, guided by the relevant standard of proof" does not and should not transform the judge's role under Rule 29 into weighing the trial evidence.

### C.  Other Sufficiency-of-the-Evidence Cases

The majority opinion compares the evidence in this case to other sufficiency-of-the-evidence cases, and concludes it falls short because the phone calls and Labno's testimony are not

corroborated by "actual evidence" of drugs. On comparison, that conclusion does not hold up.

In the case law the majority cites, we have found sufficient evidence to support a conviction when there is pole camera video surveillance of the defendant (*United States v. Cejas*, 761 F.3d 717 (7th Cir. 2014)), third-party testimony, (*Cejas*), loose association with a co-defendant (*United States v. Duarte*, 950 F.2d 1255 (7th Cir. 1991)), carrying a "tool of the drug trade" (*Duarte*), and expert interpretation of defendant's drug deal records (*Duarte*). Some combination of this evidence has been sufficient to convict on drug distribution charges, even when there are no drugs (*Cejas*; *Duarte*), no cash (*Duarte*), no weapons (*Duarte*), no drug paraphernalia (*Cejas*; *Duarte*), and no direct admissions (*Cejas*; *Duarte*). In contrast, we have found insufficient evidence when recorded phone conversations between co-defendants lack detail (*United States v. Jones*, 713 F.3d 336 (7th Cir. 2013)), and when the government's case is "focused on" (*id.* at 347) the defendant's "mere presence" at the crime scene (*Piaskowski v. Bett*, 256 F.3d 687 (7th Cir. 2001)).

Here, it is undisputed it was Garcia's voice on the phone call recordings with Cisneros; photo and video surveillance from a pole camera showed Garcia at Cisneros's residences on April 17 and April 20; police officers were present at the exchange on April 20 and later identified Garcia as the same person on both days; two cell phones were found in Garcia's possession and call logs corroborated Garcia's conversations with Cisneros; and expert testimony interpreted the terms Garcia used and the context of his calls with Cisneros as a drug deal. Garcia's use of his cell phone as a "tool of the drug trade" and Labno's interpretation explaining the coded drug

deal is like the *Duarte* defendant using a pager and that expert's interpretation of the defendant's notes as records of drug deals, which we deemed sufficient. And unlike the recorded conversations in *Jones*, which lacked sufficient detail, Garcia's eight conversations with Cisneros cover every aspect of their on-going deal, from price, quality, and quantity to maintaining a good reputation as a dealer. All this evidence adds up to far more than "mere presence," and, most importantly, far more than "no evidence." Further corroboration is not necessary. *See Smallwood*, 188 F.3d at 913 ("[corroborative evidence] need only ensure the reliability" of testimonial evidence) (internal citation omitted).

In comparing these cases, the majority hints at a false distinction between direct and circumstantial evidence, signaling that the strength of the evidence depends on its weight. The law makes no such distinction, and circumstantial evidence can form the basis for guilt beyond a reasonable doubt. *See United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) ("A verdict may be rational even if it relies solely on circumstantial evidence."); *see also United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000) ("A jury's verdict may rest solely on circumstantial evidence."). Here, the jury was instructed that "[t]he law makes no distinction between the weight to be given to either direct evidence or circumstantial evidence." The jurors followed those instructions, and found Garcia guilty.

Based on the evidence the government submitted in this case, a rational jury could reasonably conclude: (1) Garcia's phone call with Cisneros on April 17, 2012[5] was about selling

---

[5] In his motion, Garcia incorrectly cited these dates as in 2013.

cocaine; (2) Garcia physically delivered cocaine to Cisneros's residence on April 17, 2012; (3) Garcia used the cell phone officers found in his possession to communicate with Cisneros about the cocaine sale; and (4) Agent Labno's testimony, the pole camera photo and video surveillance, the in-person identifications of Garcia at Cisneros's homes on April 17 and April 20, the phones found in Garcia's possession and the call logs all support a drug-related interpretation of the recorded telephone conversations between Garcia and Cisneros from April 17, 2012 through April 20, 2012.[6]

Because Garcia failed to rebut the presumption of conviction by showing the government submitted no evidence for a rational factfinder to find him guilty beyond a reasonable doubt, the legal standard requires that we defer to the jury's verdict. For these reasons, I respectfully dissent from the majority's opinion.

---

[6] Although the Rule 29 motion "need not spell out the particular basis for a challenge to the sufficiency of the evidence, when such a motion raises specific arguments, any claims not presented in the motion are waived." *United States v. Moore*, 363 F.3d 631, 637-38 (7th Cir. 2004) (defendants "lost the right to complain about the failure of proof on a key element of the government's case" that was not specifically argued in their Rule 29 motions) (internal citation omitted). Because Garcia raised only these specific claims in his Rule 29 motion, he has waived any other grounds for acquittal.